UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-80186-CR-RYSKAMP/HOPKINS

UNITED STATES OF AMERICA,

v.

RICHARD ODELL DAVIS, III,

        Defendant.
_____/

### REPORT AND RECOMMENDATION ON THE DEFENDANT RICHARD ODELL DAVIS, III MOTION TO SUPPRESS EVIDENCE (DE 19)

**THIS CAUSE** comes before the Court upon an order of referral (DE 20). The Court has before it the Defendant's motion to suppress, wherein the Defendant challenged the August 17, 2015, seizure of evidence at 619 39th Street, West Palm Beach. (DE 19). The Government responded (DE 22), and on January 6, 2016, this Court held an evidentiary hearing. (DEs 27, 28, 54). On January 14, 2016 the Defendant filed a supplemental memorandum of law. (DE 29). On January 15, 2016, this Court held a status conference on the post-hearing pleadings. (DEs 31, 49). On January 22, 2016 the Government filed a supplemental memorandum of law. (DE 33). On January 26, 2016, this Court held another status conference on the post-hearing pleadings. (DEs 35, 50). On February 3, 2016, the Defendant filed a reply memorandum of law. (DE 41). On February 19, 2016, this Court held another evidentiary hearing. (DE 52). On February 22, 2016, the Government filed a notice of supplemental authority (DE 55) and the Defendant responded. (DE 56).

For the reasons that follow, this Court RECOMMENDS that the Defendant's motion be DENIED.

## FINDINGS OF FACT

Based upon the evidence introduced at the evidentiary hearings, this Court makes the following findings of fact. The defendant was arrested by the West Palm Beach Police Department (WPBPD) on August 17, 2015, for possession of a firearm by a convicted felon. The arrest occurred at approximately 11:09 p.m., at the defendant's grandmother's house. The property is a single story residence located at 619 39th Street, West Palm Beach in a high crime area. The Defendant had been arrested approximately 13 times in recent years. For 3 of those arrests-on January 19 and September 27, 2013, and July 9, 2014-the Defendant's address was listed as 619 39th Street.

Police officers Stephen Mooney, Joseph Myers and Officer Ruiz approached 619 39th Street in an unmarked vehicle. (DE 54, pg 159). The officers were wearing tactical police outfits identifying them as police. (DE 54, pg 176). Officer Mooney was aware that Defendant was a convicted felon and a documented gang member (DE 54, pgs 157-58). Officer Mooney saw the Defendant seated in the front passenger seat of a vehicle parked in front of 619 39th Street, looking back at the approaching unmarked vehicle. (DE 54, pg 167-68). The Defendant jumped out of the vehicle and ran up the walkway through the open gate in the middle of the 3 foot tall concrete wall in front of the house up to the front door of 619 39th Street. (DE 54, pgs 168-72). Officer Mooney (a very credible witness) testified that in his many previous encounters with Defendant the only times when the Defendant has fled from him were when he had drugs or guns in his possession. (DE 54, pg 200). The Defendant was holding his right hand on his waistband, gripping the front of the waistband of his shorts. (DE 54, pg 173-74). He kept his arm on the object he had in his shorts. Officer Mooney assumed he was holding onto a firearm. (DE 54, pg 174). He tried the door handle and then quickly walked along the front porch to the left side corner of the house (not to the

right side of the house where the driveway was) and peeked back at the officers. (DE 54, pg 172). Officer Myers exited the vehicle to pursue the Defendant, who fled along the left side of the house.

Officer Myer followed Defendant clockwise around the house to the driveway on the right side of the house. (DE 54, pgs 180, 213). The Defendant was walking very fast. (DE 54, pg 213). Officer Myer observed from the back of the driveway the Defendant tossing a firearm onto the roof from the driveway near the front of the house. (DE 54, pgs 180, 214). The firearm landed on the flat roof about 4 feet from a wall at the edge of the roof. The Defendant was then detained at the front of the house between the sidewalk and the curb. (DE 54, pgs 217, 222).

The officers were concerned about the evidence being removed should someone gain access to the roof and about any DNA evidence being lost due to precipitation or being handled by anyone else. (DE 54, pgs 183, 190). The officers were also concerned that if someone accessed the roof they could have used the firearm on them. (DE 54, pg 191). Officer Mooney climbed onto the roof and retrieved the firearm and magazine within 20 minutes of it being thrown there. After retrieving the firearm the Defendant was advised that he was going to jail for being a felon in possession of a firearm, after which Defendant uttered, "it's hot out here." (DE 54, pg 192).

The Defendant testified that he had a bedroom at the residence and that he had a key which he relinquished to his friend when he was arrested. After the Defendant was arrested, he was allowed to hand over some keys, which might have included keys to the grandmother's residence, to a friend. (DE 54, pg 127). According to a reliable, recorded statement of the Defendant's grandmother made on October 12, 2015, the Defendant had been staying at her residence for quite some time prior to her September 5, 2015 birthday. (GX12). She would see him every day since he was helping her take care of his nephew, who also resided there. (GX 12).

## ANALYSIS

The Defendant seeks to suppress the firearm seized by Officer Mooney on August 17, 2015 as a violation of the Fourth Amendment to the United States Constitution. The Defendant also seeks to suppress any statements made by the defendant following his arrest as fruit of the poisonous tree.

### A. *Standing*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." A party alleging an unconstitutional search under the Fourth Amendment must establish both a subjective and an objective reasonable expectation of privacy in order to succeed. *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967). The subjective component requires that the person show an actual expectation of privacy, while the objective component demands that the "privacy expectation be one that society is prepared to recognize as reasonable." *Katz, supra; United States v. Robinson*, 62 F.3d 1325 (11th Cir. 1995). What matters is whether the defendant has a reasonable expectation of privacy in the place searched, not the things seized. *United States v. Salvucci*, 448 U.S. 83 (1980) (abolished automatic standing rule in cases involving possession offenses).

The burden to establish a legitimate expectation of privacy falls upon the defendant. *Rawlings v. Kentucky*, 448 U.S. 98 (1980); *United States v. Cooper*, 133 F.3d 1394 (11th Cir. 1998). *United States v. Chavers*, 169 F. 3d 687 (11th Cir. 1999) (a fleeting and insubstantial connection with a home is not a reasonable expectation of privacy); *see also, United States v. Vasquez-Padilla*, 330 Fed. Appx. 883 (11th Cir. 2009) (occasional temporary access coupled with

the presence of some personal effects, without any ownership interest, was insufficient to establish a reasonably subjective expectation of privacy); and *United States v. Rivera-Pabon*, 2012WL 4936571 (11th Cir. 2012) (absent evidence of ownership, a defendant's mere occasional presence and possession of a key were insufficient to establish a reasonable expectation of privacy)).

It appears that Defendant regularly stayed at the residence at the time of the arrest. His testimony to that effect is corroborated by his designation of that address when arrested 3 times in the 2 years prior to the instant arrest, his transfer of keys (which may have been to the residence) to his friend upon being arrested, his presence at the residence after 11 pm on the night of the arrest, and his grandmother's credible statement shortly after the arrest about him staying there regularly. Thus Defendant has shown a reasonable subjective expectation of privacy in the premises. *See United States v. Wilson,* 36 F.3d 1298, 1303 (5th Cir. 1994) (reasonable expectation of privacy not relinquished where defendant left checkbook in wastebasket of hotel room in which friend was living and defendant was friend's overnight guest there); *United States v. Taylor*, 600 F.3d 678, 683 (6th Cir. 2010) (reasonable expectation of privacy in aunt's apartment where defendant was at least temporarily staying).

### B. *Curtilage*

Searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586, 100 s.ct. 1371, 1380, 63 l.ed.2d 639 (1980). "Police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S.Ct. 2458, 2459, 153 L.ed.2d 599 (2002). "[R]easonable suspicion cannot justify the warrantless search of a house." *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir.1991).

It is well established that the protection provided by the Fourth Amendment extends to the "curtilage" area of a house. *See United States v. Dunn*, 480 U.S. 294, 300-01, 107 S.Ct. 1134, 1139-40, 94 L.Ed.2d 326 (1987); *Dow Chem. Co. v. United States*, 476 U.S. 227, 235, 106 S.Ct. 1819, 1825, 90 L.Ed.2d 226 (1986); *California v. Ciraolo*, 476 U.S. 207, 212-13, 106 S.Ct. 1809, 1812-13, 90 L.Ed.2d 210 (1986); *Oliver v. United states*, 466 U.S. 170, 178, 180, 182 n. 12, 104 S.Ct. 1735, 1741, 1742, 1743 n. 12, 80 L.Ed.2d 214 (1984). Indeed, the curtilage is considered part of the house itself for Fourth Amendment purposes. *Oliver,* 466 U.S. at 180, 104 S.Ct. at 1742.

In *Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742 (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)), the Supreme Court related that at common law curtilage was defined to include those areas "to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" (citations omitted).

In *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139-40, 94 L.Ed.2d 326 (1987), the Court explained that curtilage questions should be resolved with reference to four factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. The court cautioned, however, that it was not announcing a rigid test. "Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration-whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of fourth amendment protection." *Id.*

There is no reasonable expectation of privacy for activities conducted out of doors, except in the areas shielded from view and immediately surrounding the home, areas that an individual

reasonably may expect will remain private and suitable for intimate activities. *Oliver*, 466 U.S. at 178-180, 104 S.Ct. at 1735-42 (1984).

The presence of a "No Trespassing" sign does not itself create a legitimate expectation of privacy. *Oliver*, 104 S.Ct. at 1743, 466 U.S. at 182 (1984).

In *United States v. Galaviz,* 645 F.3d 347, 355-56 (6th Cir. 2011), the Court examined whether a driveway was included within the curtilage:

> Here, the driveway was directly adjacent to the house. However, it was not enclosed by a fence or other barrier and was short, with the portion of the driveway where Galaviz's car was parked directly abutting the public sidewalk. Further, no apparent steps were taken by the residents of the house to protect the driveway from observation by passersby-no hedges or bushes obstructed the view of the driveway from the sidewalk or street, for example. *See Estes*, 343 Fed. Appx. at 101 (using these factors to find driveway not to be curtilage); *see also United States v. Pineda-Moreno*, 591 F.3d 1212, 1215 (9th Cir.2010) ("[b]ecause [defendant] did not take steps to exclude passersby from his driveway, he cannot claim a reasonable expectation of privacy in it, regardless of whether a portion of it was located within the curtilage of his home.").

*Id.*

In the instant case the house was mostly surrounded by a chain link fence, with a low wall along much of the front of the property separating the house from the sidewalk, and "No Trespassing" signs at the front and rear of the property. However, the base of the driveway adjacent to the house was completely open. All of the property was open to inspection through the chain link fences, over the low front wall or from the base of the unenclosed driveway. All of the property surrounding the house itself (which the Defendant and Officer Myers traversed) was easily accessible from the open driveway. A basketball hoop was in the driveway, along with a swing set. Lawn furniture was placed at various locations around the outside of the house.

Here, the officer was at the back of the driveway when he observed the Defendant throw the firearm onto the roof from the middle of the driveway, close to the front of the house. As in *Galaviz*, the Defendant did not have a legitimate expectation of privacy in the driveway. Passerbys

were not excluded from the driveway (nor the rest of the perimeter of the house), and unobstructed views of the entire driveway were readily available. Thus the Defendant did not have a reasonable expectation of privacy when he threw the firearm, and being in the open driveway the officer was lawfully in a position to view it.

Moreover, the side and backyards of the house were also not shielded from public view, or intrusion via the driveway, and thus were also not protected areas. The officer was justified in following the Defendant around the house based upon his reasonable suspicion.

### C. The Arrest

The defendant was lawfully detained by the WPBPD based upon reasonable suspicion and his arrest was based upon probable cause. Law enforcement may stop and briefly detain a person to dispel an officer's reasonable suspicion that the person has committed or will commit a crime. *Terry v. Ohio*, 392 U.S. 1 (1968). "Reasonable suspicion" is more than just a hunch, but rather based upon objectively reasonable facts that justify the detention. *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). Probable cause to arrest a person exists when an officer has knowledge of facts and circumstances sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime. *Beck v. Ohio*, 379 U.S. 89 (1964); *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007); *United States v. Floyd*, 281 F.3d 1346 (11th Cir. 2002). In assessing whether there is probable cause to arrest someone, the court must evaluate the objective facts without regard to the subjective beliefs of the police. *Craig v. Singletary*, 127 F.3d 1030 (11th Cir. 1997). The court must also evaluate the available evidence in its totality and not consider the individual items of information in isolation. *United States v. Allison*, 953 F.2d 1346 (11th Cir. 1992). Finally, the court may consider the collective knowledge of law enforcement if

the officers maintained at least a minimal level of communication during the investigation. *United States v. Willis*, 759 F.2d 1486 (11th Cir. 1985).

In this case, the officers initially had reasonable suspicion that the defendant was engaged in criminal activity when they chased after the defendant. That reasonable suspicion developed into probable cause once the defendant discarded the firearm in Officer Meyer's presence.

Reasonable suspicion initially existed and ripened into probable cause based upon the following articulable facts: (1) the residence was in a high crime zone; (2) it was nighttime; (3) the specific residence was known for drug activity and firearm violations; (4) Officer Mooney observed the defendant look at his unmarked vehicle while the defendant was sitting in a parked car; (5) Officer Mooney observed the defendant initially jump out of the parked car and run to the front door of the residence as the unmarked police car got closer; (6) Officer Mooney knew that in his many previous encounters with Defendant the only times when the Defendant has fled from him were when he had drugs or guns in his possession; (7) the officers observed the defendant holding his waistband in a manner that was consistent with attempting to hide drugs or a weapon; (8) it appeared that the defendant was locked out of the residence and did not have a key; (9) the officers then watched the defendant walk quickly to the western side of the house, rather than the eastern side of the house where the driveway was located; (10) the officers recognized the defendant who was a known felon, drug dealer and gang member; (11) the defendant walked completely around the western, northern and eastern side of the residence in the darkness; and (12) the defendant pulled a silver and black handgun from his waistband and threw it on top of the residence.

Probable cause to arrest the defendant for firearms violations developed after he was observed throwing the firearm on the roof. They had probable cause to arrest the defendant for

carrying a concealed firearm, in violation of Florida Statues, Section 790.06 based upon the observation that the defendant retrieved a firearm from his waistband where it was initially out of sight.

Under Florida law a person may legally carry a concealed firearm if they have a concealed carry permit; however, that is an affirmative defense and not an element that must be disproven by the State. *United States v. Montague*, 437 Fed. Appx. 833, 835 (11th Cir. 2011) (unpublished opinion) *citing, Watt v. State*, 31 So.3d 238, 242 (Fla. 4th DCA 2010). In *Montague*, the Eleventh Circuit upheld the denial of a motion to suppress where the police officer had reasonable suspicion that a defendant was in possession of a concealed firearm, but did not know if the suspect had a concealed weapons permit.

Moreover, the officers had probable cause to arrest the defendant for possession of a firearm by a convicted felon, in violation of Florida Statutes, Section 790.23(1)(a), and under federal law for being a felon in possession of a firearm. The officers knew and confirmed by running the defendant's criminal history that he was a convicted felon.

### D. *the Seizure of the Firearm and Ammunition:*

What a person knowingly exposes to public view is not protected by the Fourth Amendment. *Katz*, 389 U.S. at 351, 88 S.Ct. at 511.

In the instant case the area of the roof where the firearm was thrown was observable from the second story of the adjacent residence. Consequently, the officer's search of the roof for the firearm did not implicate the Fourth Amendment. *See United States v. Broadhurst*, 805 F.2d 849, 856 (9th Cir. 1986) (aerial surveillance of marijuana plants through translucent roof did not amount to "search" which would have required warrant under the Fourth Amendment); *Ambrose v. Unicoi County, Tenn.*, 2010 WL 3861069, at *6 (E.D.Tenn., 2010) (no expectation of privacy on roof

exposed for anyone situated at a higher elevation to see).

Moreover, the officers were legitimately concerned about the dissipation of DNA evidence on the gun that could occur from precipitation on the exposed roof during the several hours it could take to secure a warrant. As the Supreme Court has recognized:

> [T]he government's interest in dispensing with the warrant requirement is at its strongest when, as here, "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Camara v. Municipal Court of San Francisco, supra*, 387 U.S., at 533, 87 S.Ct., at 1733. *See also New Jersey v. T.L.O.*, 469 U.S., at 340, 105 S.Ct., at 742; *Donovan v. Dewey*, 452 U.S. 594, 603, 101 S.Ct. 2534, 2540, 69 L.Ed.2d 262 (1981). As the FRA recognized, alcohol and other drugs are eliminated from the bloodstream at a constant rate, *see* 49 Fed.Reg. 24291 (1984), and blood and breath samples taken to measure whether these substances were in the bloodstream when a triggering event occurred must be obtained as soon as possible. *See Schmerber v. California*, 384 U.S., at 770–771, 86 S.Ct., at 1835–1836. Although the metabolites of some drugs remain in the urine for longer periods of time and may enable the FRA to estimate whether the employee was impaired by those drugs at the time of a covered accident, incident, or rule violation, 49 Fed.Reg. 24291 (1984), the delay necessary to procure a warrant nevertheless may result in the destruction of valuable evidence.

*Skinner v. Railway Labor Executives' Ass'n*, 109 S.Ct. 1402, 1416, 489 U.S. 602, 623 (1989).

Furthermore, the officers were legitimately concerned that a resident of the premises could remove the firearm or alter DNA evidence on it. *See United States v. Franklin*, 694 F.3d 1, 7-8 (11th Cir. 2012) (warrantless search justified where officer had probable cause to believe that the residence contained firearms evidence that *might* be hidden or removed before he could obtain a search warrant).

Consequently the warrantless search and seizure of the firearm and ammunition did not violate the Fourth Amendment.

Accordingly, this Court **RECOMMENDS** that Defendant's motion to suppress evidence (DE 19) be **DENIED**.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Senior United States District Judge Kenneth L. Ryskamp within fourteen (14) days after being served with a copy. See 28 U.S.C. § 636(b)(1)(C). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. See *United States v. Warren*, 687 F.2d 347, 348 (11th Cir.1982), *cert. denied*, 460 U.S. 1087 (1983).

DONE AND SUBMITTED in Chambers this 1 day of April, 2016, at West Palm Beach in the Southern District of Florida.

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE